## CHATTANOOGA-DAYTON BUS LINE, et al. v. EDYTH LYNCH.

Eastern Section.   July 23, 1927.

Petition for Certiorari denied by Supreme Court, February 10, 1928.

1. **Negligence. Evidence. Where there is evidence showing a reason for a bus running off of the road, the fact that it left the road raises no presumption of negligence.**
   In an action to recover for personal injuries sustained in a bus wreck where there was evidence offered to show an emergency which caused the bus to leave the pavement, held that the fact that it left the pavement raises no presumption of negligence.

2. **Negligence. Burden of showing negligence is on the plaintiff.**
   Plaintiff must show by preponderance of the proof that the defendant is negligent and the burden is never placed on the defendant to show by the preponderance of proof that he was not guilty of negligence, proximately causing or contributing to the injuries.

3. **Trial. Evidence. The burden of going forward may shift but the burden of proof never shifts.**
   Burden of proof and burden of going forward with the evidence distinguished by the court, and held that the burden of proof never shifts from the party who is first required to bear it.

4. **Negligence. Doctrine of res ipsa loquitur does not require defendant to show himself free of negligence.**
   The doctrine of res ipsa loquitur requires the defendant to first explain but it does not dispense with the rule that he who alleges negligence must prove it. It simply changes the mode of proving negligence but does not change the burden of proof.

Appeal from Circuit Court, Hamilton County; Hon. Oscar Yarnell, Judge.

Reversed and remanded.

W. E. Wilkerson, of Chattanooga, for appellant.

Same H. Ford, of Chattanooga, for appellee.

SNODGRASS, J.  In this cause on May 25th the appeal was stricken from the docket and the decree of the circuit court affirmed, upon the ground that the record failed to show any motion for a new trial was filed within thirty days from the entry of the final judgment. Plaintiff in error under the rules had ten days within which to file a petition to rehear, but obtained additional time, and now comes and moves the court to be permitted to suggest the diminution of the record, and files an additional record made up upon nunc pro tunc proceeding in the meantime had in the circuit court since the original hearing and since the opinion dismissing the appeal was filed in the cause.

From this additional record it now appears that the motion for a new trial was actually made and acted upon on July 19, 1926, upon

the call of the motion docket upon that date, which motion for a new trial, which was in writing, was filed with the clerk of the court of July 14, 1926, said motion for a new trial being heard on the first motion day after it was filed; that the court, after hearing argument by attorneys representing the respective parties, took the motion under advisement, and held it under advisement until August 2, 1926, continuing the motion in the meantime, when an order was made overruling the said motion for a new trial and granting the defendants thirty days in which to prepare bill of exceptions, make appeal bond, etc.; and it appearing that no entry of the order was made on said date, to-wit, July 19, 1926, evidencing that said motion for a new trial was argued on that date and taken under advisement by the court, the motion being continued pending the action of the court on said motion, but that through inadvertence, oversight, omission or otherwise it was not entered, it is hereby ordered that this order be entered nunc pro tunc.

It thus appears that the motion was made and acted upon within the time. The clerk has given notice of the filing of this motion, and the defendant in error has not made any resistance to this application or filed any reply brief, for which reason we have pretermitted any question of negligence that might appear or any strict application of the rules, and have set aside the judgment heretofore entered, granted a rehearing, and have considered the case upon the whole record thus stripped of the condition which necessitated the affirmance of the judgment on striking the appeal.

The statement of the case is found in our original opinion.

Upon the merits the assignment in the second and fourth specifications, that the verdict is against the greater weight of the evidence, is not available here, and the specification in the said two assignments, and in the third, that it is contrary to law, will depend upon the conclusion that may be reached under the remaining assignments, the first being that "there is no evidence to support the verdict."

The fifth is, that "the verdict is excessive, and so excessive as to show passion, prejudice and caprice on the part of the jury."

The sixth is, "the court charged the jury erroneously and prejudicially to defendants as follows:

"If she (meaning the defendant in error) was a passenger on this bus, and the defendant was a common carrier of passengers, running it for hire and reward, carrying passengers for hire, and if it is shown that this bus was turned over on its way to Soddy, at a point about Red Bank, by running out of the road into the ditch, or off the bank, or against the bank, and if it is thus shown that plaintiff as a result of that bus turning over, or careening over, toppling over against the bank or into the ditch, was injured, then the law presumes—there is a presumption that the defendant was guilty of negli-

gence in the operation of it, and the burden would be upon the defendant to show by a preponderance of the testimony that it has not been guilty of negligence, its driver has not been guilty of negligence in the operation of the bus, to show by the greater weight or the preponderance of the testimony that the driver exercised that high degree of care that the law requires of common carriers of passengers.''

There can be no doubt under the proof that plaintiff in error was operating the bus as a common carrier of passengers for hire at the time of the injury, and further, that at said time the defendant in error was a passenger upon the same and was injured, and that the injuries were caused by the bus leaving the paved highway and careening over toward its side, and precipitating the defendant in error over against the side, the pipe they heat the bus with catching and burning her left foot. She struck against the seat or something, which dislocated the shoulder, and some malformation exists, which has or may cause permanent injury. She stated on cross-examination that in falling her foot slipped under the pipe, and that it threw her between the two seats on the right hand side, causing her shoulder to go against the corner. From the cross-examination the following appears as to the manner of the accident:

''Q. The car learned over toward your right, did it? A. Yes sir.

''Q. Did you put your right hand out, put it against the seat across the isle and brace yourself? A. No sir, the first thing I knew of it I was trying to get up out of the floor, and this foot was hung under the hot pipe.

''Q. Do you mean to testify you fell on the floor in the aisle? A. Yes sir, between these two seats, and this foot was under the pipe.''

There was further cross-examination, but enough is quoted to show how she received the injury, so that if the proof showed the driver was negligent in leaving the paved highway on which they were running, a liability was established. Defendant in error was not shown to have herself been guilty of any negligence proximately contributing which would have barred a recovery. As to why the bus left the highway she herself testified in part:

''We left town, we are supposed to leave at six o'clock, and we got about Red Bank, I guess it was about 6:30, somewhere along there, and we got right there in the main part of town and started to pass another car, and it had been raining on Monday and Tuesday, and then as we started to pass the other car, the driver I suppose is what caused it, he got out too far and the bus slid over into that embankment.'' On cross-examination she stated that she was looking out all the time and saw the other car coming; that the driver of the bus turned over to the right hand side of the road to let the car pass; that he had slowed up to pass this car, but never did stop; that he kept

trying to pass it all the time; "had he stopped I don't guess we would have got over that far, but he did not stop; he kept going all the time; there was a car coming meeting us, was the reason we went over there." The cross-examination continued:

"Q. Were you going from town toward Dayton? A. Yes sir, and he was coming toward town.

"Q. There was a car coming down to town, meeting you, which was being driven pretty fast, wasn't it? A. I don't know just how fast he was driving. I just know he was trying to pass the car.

"Q. The driver of this bus turned out so that he would not hit the car that was coming through to town? A. Yes sir.

"Q. And the car coming to town shot right on through and came on, did not stop, did it? A. If it stopped I did not know it.

"Q. This bus had turned over? A. It turned over just as far as it could, but that rise there held it up on the side, and it was leaned until it caught the door that goes down to make the step. I guess they kicked the door and window and broke them out. I don't know who pulled me out.

"Q. The car careened over against the bank, did it not? A. Yes sir.

"Q. It did not turn against the bank, did it? A. Yes sir; it slid over in there and turned just as far as it could.

"Q. The car did not fall over on its side? A. No sir.

"Q. It careened over at an angle of thirty-five or forty degrees? A. I couldn't say just how it lont (leaned).

"Q. Anyhow the people got out on the side next to the bank, towards which it was leaning? A. Yes sir.

"Q. The car just eased over, didn't it? A. Yes sir.

"Q. There was no big jolt or concussion, anything like that? A. It was done so quick, I don't know how it was done, hardly."

On re-examination she stated that it was dark when it happened; that it was in the winter time, the 15th of December, at about 6:30.

John L. Smith, a witness for the plaintiff, did not see the accident, but came there shortly afterwards, and could not get by and stopped; saw the bus in the ditch, with the wrecker trying to pull it out. He said it was an oiled highway; that he never measured it, but judged it between fifteen and eighteen feet wide, that is, the oiled part; that there was some gravel or chert on the sides, which makes it still wider, he thought; that where the accident happened there was an embankment, that he did not believe it would be called a ditch, just an embankment; that the ditch was further over in the woods there; that it was dark, and he thought it was or had been raining; that when he got there the bus was leaning on the side and the wrecker was pulling it out of this embankment into the road, or was trying to; that the bus had gotten over into the soft dirt; that the highway department

had recently been doing some work there, had widened the road between there and town, and when he saw it the right wheels of the bus had gotten over into the soft dirt; that it was about eight o'clock when he happened on the scene, and the people had gotten out and were standing around.

Miss Edna Lynch, a sister of the party injured, testified:

"Well, there was a car coming toward Chattanooga. We were going north. Just as we started to pass the car, it was an embankment there, and the driver seemed as if he did not know whether to pass the car or stop, and it seemed that he was was trying to pass it, anyhow it did not stop until we were in the ditch, and the wheels crushing—you could hear the sound of the wheels going over the embankment."

On cross-examination she stated that they were meeting a car; that they were going north and it was going south. She was asked:

"Q. There was a truck parked on your left-hand side, headed toward Chattanooga at that time, wasn't there? A. A truck on my left-hand side.

"Q. Yes, on the other side of the car from where this bus was? A. Do you mean setting on the road?

"Q. Yes. A. Now I didn't see any truck setting on the side of the road although I believe there was a truck in the ditch, that had a wreck there, but it was on beyond where we were.

"Q. Whoever was driving this car coming to town met you about the time you reached that truck that was in the ditch there, is that right? A. I don't remember just how close we were to the truck that was already in the ditch.

"Q. Did you see the car coming? A. The car coming?

"Q. Yes. A. Well, yes, I did.

"Q. Now, that car was on your left-hand side? A. It was on the left-hand side, yes sir. We were on the right-hand side.

"Q. And the right-hand side of the road going to Dayton was open? A. Yes sir, it was open.

"Q. Did you see the driver coming to town swerve out to pass that truck? A. You mean the driver of the bus?

"Q. No, the driver of the car coming to town, did you see him dart out from behind the car and get out in the middle of the road, or on the right-hand side of the road? A. I did not.

"Q. You do not know whether he looked like he was going to stop or not? A. I don't think he ever did stop. If he did I did not know anything about it."

She said Andy Foster was driving the bus; that she had been riding with him a long time, both before and after the accident; she had been a regular customer of the bus for something like two years. She said she did not know that he slowed the bus down when he saw the car

coming; that he acted as though he did not know whether to try to pass the car, stop, or go into the ditch; that anyhow he went off the embankment.

"Q.  Do you know whether he was trying to decide to have a head on collision, go into the ditch, or what?  A.  I don't know what he was deciding to do; he acted as if he didn't know what to do."

The testimony of Mr. Jackson, another witness for the defendant in error, neither added to nor detracted from the testimony above set out, except that on cross-examination he said that he guessed Foster had been doing twenty-five miles an hour, but of course he had slowed up when he started to meet the other car; that when he saw the other car coming he slowed down, but how fast he was going he did not know; that work had recently been done on the road there; that it was soft on each side, loose dirt, and that what happened was that the bus got its right wheels in that loose dirt and just tilted over; that it was not thrown over, did not turn over, went over easily, just eased over, careened over, and it could not get out because it was caught in the soft mud, and the wheels would not pull out with the engine running; had to get a wrecker to pull it out.  This was substantially the plaintiff's testimony as to how the accident occurred.

Andy Foster, the driver, who seems to have had experience of some years in driving cars and busses, testified as follows:

"I was going out to Soddy.  I got out to Red Bank, and there was a truck wrecked on the left hand side of the road, a car standing just beyond the truck, standing there looking at it going off in there.  I saw another car coming down the road at a pretty good speed.  I don't know just how fast he was running, but he was running at a right good rate.  He started to stop in behind this car but could not, and he pulled around the car and I pulled to the right to keep him from hitting me.  When I done that there was a ridge piled up along the road.  I felt it go onto the dirt and it started to sliding, and eased off in the ditch.  It turned over—it didn't turn over, it kind of slipped off and leaned over; I got the door open and when we all got out I asked everyone if they were hurt.  Miss Lynch said her ankle was burnt.  And I asked all the rest of them, and they said there was not anybody hurt that they knowed of.  I tried to find out from everyone and they said there was not anybody hurt at all.  I tried to get Miss Lynch to go up and have something done for her ankle at the drug store in Red Bank.  She said, no, she would wait to get home. We got the bus out and I went and called Mr. Wingate and he got the wrecker and come out with it and got the bus out and we all got in and went on to Soddy."

"Q.  You say, I believe, that the truck had turned over?  A.  Yes sir.

"Q.  And there was a car behind that?  A.  Yes sir.

"Q. Then you saw a car coming toward town? A. Yes sir.

"Q. How fast would you say that car was coming? A. Well, I just, I suppose—of course I could not say just exactly, but he was running I guess right around thirty miles an hour, maybe a little more, just the best I could tell, I don't know for sure.

"Q. Was the street wet? A. Yes sir.

"Q. How fast were you going? A. I could not say; I guess between twelve and fifteen miles an hour.

"Q. State whether or not the man who was coming toward town at rate of about thirty miles an hour veered out to keep from hitting this car standing there behind the turned-over truck? A. Yes sir, he pulled out, I don't know, I never noticed very good, but he pulled around far enough to miss the other car, and there was a curve where we met.

"Q. What did you do when you saw him pull out into the road to miss the car and truck? A. I pulled over and tried to give him room, to keep from hitting him head on in a collision.

"Q. If you had gone straight on, state whether or not he would have hit you? A. Yes sir, he would have hit me straight in the face.

"Q. State whether or not the right-hand side of the road you were going on north was open? A. Yes sir, the right-hand side was open.

"Q. How fast were you going at the time your car got over in the soft mud and careened over? A. I would say right around twelve miles an hour.

"Q. State whether or not there was any jar or jolt when it got in there? A. No sir, it was not, it was in the mud, just got in the mud and eased right down.

"Q. How did the people get out of the bus after the bus stuck in the mud? A. They all came out of the door, Miss Leib, somebody let down the window and helped her out of the window; the rest got out of the door.

"Q. On the lower side? A. Yes sir.

"Q. Could you open the door on the lower side? A. I could open it about half open."

On cross-examination he testified as follows:

"Q. You say the truck was turned over in the highway? A. Yes sir.

"Q. Why did you not stop? A. There was not any need stopping, it was already off the road into the ditch.

"Q. Was it out of the road? A. Yes sir, it was off in the ditch.

"Q. Turned over out of the road? A. Yes sir.

"Q. Now, then, you say there was another car stopped there? A. Yes sir.

"Q. That car was in the road? A. Yes sir.

"Q. You saw the wreck up there? A. Yes sir.

"Q. Saw the car turned over there, out of the road and saw another car standing in the road? A. Standing at the side of the road, on the left hand side.

"Q. All right, that is the left hand side going north; and then you saw another car coming from Dayton, running thirty miles an hour? A. Somewheres about that.

"Q. How far up the road was it when you first saw it? A. He was up about that filling station.

"Q. That is a block and a half away when you first saw it? A. No sir, it was not a block and a half, it was not hardly a half block.

"Q. About 200 feet? A. I suppose so.

"Q. And you saw that situation and never stopped your car? A. No sir.

"Q. You had it loaded with passengers? A. Yes sir.

"Q. You were running twelve miles an hour, with that wreck right ahead of you, another car standing in the road, and another car coming meeting you, coming thirty miles an hour and you did not stop? A. I was not supposed to stop.

"Q. I did not ask you about being supposed to stop; you did not stop? A. No sir.

"Q. He was coming thirty miles an hour? A. Somewhere about that.

"Q. You were getting up close to where the wrecked car was? A. I had passed the truck and was about even with the other car.

"Q. You were within 200 feet of that car wrecked and saw the car coming thirty miles an hour? A. I don't know whether it was thirty, but about thirty.

"Q. You saw the wrecked car standing there, and another in about twenty or twenty-five feet, and then behind that you saw this car coming thirty miles an hour. That is what you told Mr. Wilkerson. A. I said it was about that, I did not say for certain.

"Q. You were running twelve miles an hour and could have stopped on what distance? A. I could have stopped in six feet."

On redirect examination he said:

"Q. You say when you started to go by, you had gone by the car that was in the ditch? A. Yes sir.

"Q. And your side of the road was open? A. Yes sir, my side of the road was clear.

"Q. And you pulled to the right so that the other car could come on by? A. Yes sir.

"Q. What became of that car that came by? A. I don't know, I never saw the other car after we got out.

"Q. How long did it take you to stop after you applied the brakes? A. I could not hardly say; I guess it went about twelve feet at the furtherest.

"Q. When you saw the car coming toward town, what did you do with reference to slowing up, stopping? A. I put on my brakes and pulled over, because I knew if he hit me straight in front there would be somebody badly hurt. I tried to give him room there to get through.

"Q. When did you begin doing that? A. As soon as I saw him coming behind the other car.

On re-cross examination he stated:

"Q. You said awhile ago you could stop in six feet? A. Yes sir.

"Q. You were in the road when you saw the car coming, were you? A. Yes sir.

"Q. You saw the situation in front of you. If you could have stopped in six feet, you could have stopped three or four times? A. I don't know.

"Q. You saw him 200 feet away? A. Yes, he was supposed to stop.

"Q. I am not asking if he was supposed to stop. A. I know, he was supposed to stop.

"Q. He had bright headlights? A. Yes sir.

"Q. He had you blinded? A. I could see, sir.

"Q. Why did you not stay in the road? A. I hit the mud and it slid off.

"Q. You said something about some loose earth on the right-hand side of the road that you ran into? A. Yes.

"Q. Who had been making that embankment? A. I suppose it was the State Highway.

"Q. Did you see them at work? A. I saw them along every day.

"Q. How long was that put on before the accident happened? A. It had been there a right smart while, I suppose.

"Q. You knew it was there, you passed there every day? A. Yes sir.

"Q. How many trips did you make over that place that day? A. I don't know. I could not tell you.

"Q. How many the day before? A. I don't know.

"Q. You had been going along there seeing the condition? A. Yes sir.

"Q. You knew the condition was there, of course? A. Sure."

Re-direct examination:

"Q. Suppose you had stopped your car when you first saw the car coming to Chattanooga, what would have been the result? A. A head on collision.

"Q. The only thing you could do was to pull off to the side of the road? A. Yes sir; the only chance I could see was that to keep from running into the front end of it."

Re-cross examination:

"Q. I will ask you if it is not true, when your car went into the embankment, that this wrecked car, or truck, that was turned over out of the road, if it was not twenty to twenty-five feet this side, south of your car? A. No sir; I don't think it was. I think the back end of that car was just about even with the back end of the bus.

"Q. Mr. Wingate come up there, didn't he? A. Yes sir.

"Q. He saw the situation? A. Yes sir.

"Q. Don't you know that the truck turned over there, that you had passed the truck before you turned over? A. Yes sir, just a little past it."

There was other testimony bearing upon the manner of the accident not necessary to quote. There was no substantial or material conflict in the testimony as to how it occurred, and we think under the circumstances it is manifest that the instruction given, upon which error is assigned, was erroneous and prejudicial. Had there been no proof as to why the bus left the paved part of the road and careened over, precipitating defendant in error in such way as that she received the injuries, the jury would perhaps have been authorized to infer that the defendant was guilty of negligence, or that a presumption of negligence might have obtained, which is the same thing. But that is not the fact of this case. On the contrary there is an explanation of why the bus left the paved highway and the wheels sank down in the soft dirt at the side. It is shown in the evidence, and not controverted, that an emergency existed, in which negligence might not have been found by the jury upon a mere error of judgment in not stopping the car, if error it was. It was maintained by the driver that if he had stopped the car there would have been a head on collision, to prevent which he pulled to the right, when the wheels struck the soft mud and slid off the paved highway.

In the absence of any exculpatory proof it would have been harmless to have told them that to avoid liability the defendant would have the burden of showing by a preponderance of the proof that he was not guilty of any negligence proximately causing the injury, but where, as in this case, such exculpatory proof was offered, it was then for the jury to say, after considering all the proof, including such explanatory or exculpatory proof, as to whether or not the plaintiff's necessary burden of showing by a preponderance of the proof that the defendant was guilty of negligence proximately causing the injury had been carried; not that the defendant must show by a preponderance of the proof that he was not guilty of any negligence proximately causing or contributing thereto.

While onus or burden may shift, they are not synonymous terms with preponderance. Except under provision of some statute to that effect, the burden never shifts to the defendant to the extent of showing by a preponderance of the proof that he was not guilty of any proximate negligence to escape a liability. That necessity likewise

remains with the plaintiff to effect a liability, and it is only neces-
sary for the defendant to introduce proof to the extent of showing an
equipoise or even balance to defeat the plaintiff's case. The rule is
stated in The Modern Law of Evidence by Chamberlain, Vol. 2, page
1107, Sec. 941, as follows:

"In connection with trials at law, as·in other cases where an
appeal is made to reason on the basis of facts and arguments, it is
easy to use the metaphor or simile of a pair of scales. It is custo-
mary to speak of the deliberations of the jury, the balancing of
arguments, the weight of the evidence, and preponderance of the
testimony and the like. Possibly the same metophor may be of as-
sistance in connection with the burden of proof and the burden of
evidence. Under the rules governing another branch of pro-
cedure, that of pleading, in a manner hereinafter stated, one of
the parties has seen fit to stake his fortunes in the case upon his
ability to establish the affirmative of a definite proposition of fact,
that, on that proposition, he will come out at the end with a
balance of probability in his favor, that when all the evidence is
in, in whichever of the scales originally placed and whether de-
posited there by himself or his adversary, or however often the
scales may have alternated in the meantime, the final balance of
the scale should preponderate, to a definite anl predetermined
extent in his favor. The necessity of producing this final pre-
ponderance is burden of proof, properly so called. It is the
essence of such a burden that it can not shift; it is a guarantee
as to the result of the entire·proceeding. The opponent never has
this burden or any share in it. His position is that he succeeds,
if the holder of the burden fails to sustain it either because he is
unable to produce enough evidence originally or because the mat-
ter is undecided, the scales are even, at the ends. Accordingly
he who has the burden of proof, i. e., the actor, must introduce,
at the outset, evidence, or its equivalent, in support of his con-
tention. He must put something into his side of the scales until
they, level at the beginning, preponderate to the predetermined
extent. This is the burden of evidence. The two burdens are
together, in the same person. When this preponderance is
established, the burden of evidence shifts to the party who is not
under the burden of proof, the non actor or reus so called.
The latter must place some evidence in his own scale for the
purpose of destroying the otherwise fatal preponderance against
him, or if possible create a balance in his own favor. The alter-
native is to lose his cause. Should he succeed in accomplishing
either of these purposes the burden of evidence returns to the
holder of the burden of proof to restore under penalty of failure
in the case, the balance in his favor. In this way, the burden of
evidence may fluctuate between the parties until the supply of

available facts is exhausted. But nothing of all this affects, or can affect, the position of the burden of proof; that has remained constant throughout, precisely where it rested at the beginning, to-wit, on the party who originally assumed it. If, when all the evidence is in, by whomever produced, the final balance is not in his favor, he loses;—which is precisely the hazard to which he has been exposed at every stage of the trial, merely because he has the burden of proof."

None of our cases are believed to be out of harmony with this rule. Of course negligence will not be presumed from the mere fact of injury. But when facts are proved in connection with the injury, such as by his leaving the road and partially turning or careening over in such way as that the plaintiff below received injury, these are facts from which, standing alone, an inference of negligence may be drawn, as in the case of Railroad v. Kuhn, 107 Tenn. (23 Pickle) 106, 64 S. W. 202, the doctrine of res ipsa loquitur applying, but it was not held in that case, nor in any other that has been cited, that the defendant had to clear himself of the imputation of proximate negligence by a preponderance of the proof to escape liability. Not that the onus did not shift, but the measure of proof which the charge required of the defendant contains prejudicial error.

Res ipsa loquitur does not dispense with the rule that he who alleges negligence must prove it. It is simply a mode of proving negligence and does not change the burden of proof. Lyles v. Brandon Carbonating Co., 140 N. C., 25.

The presumption which arises in favor of the plaintiff in a case to which the doctrine of res ipsa loquitur applies does not cast upon the defendant the burden of proof in the sense that the defendant is bound to establish freedom from negligence by a preponderance of the evidence. Kay v. Metropolitan Street Railway Co., 163 N. Y., 407.

The rule as to burden of proof in cases like this is also stated in R. C. L., Vol. 20, page 194, Sec. 161, as follows:

"One who seeks to recover of another on the ground of negligence on the part of that other assumes the burden of maintaining not only the negligence complained of, but that such negligence has occasioned him loss. Where the facts are such as to raise a presumption of negligence, or give rise to the principle res ipsa loquitur, the burden of proceeding is shifted to the defendant, and if he would escape an adverse finding he must adduce evidence to meet the plaintiff's case. But the doctrine res ipsa loquitur does not cast on the defendant the burden of disproving negligence in the sense of making it incumbent upon him to establish freedom from negligence by a preponderance of the evidence. Although the case is one authorizing the application of the doctrine, the plaintiff, nevertheless, must assume the burden of establishing negligence by a preponderance of the evidence."

6 T. A.—31.

For this error in the charge the cause must be reversed and a new trial awarded. We think also that the liability of the security would abide the liability of the principal.

Inasmuch as there is to be a new trial of the case, we have not thought it necessary to pass upon the assignment as to the excessiveness of the verdict, but think it inexpedient at this time that this should be done. The case is therefore reversed and remanded for a new trial, and the defendant in error will pay the costs of this court.

Portrum and Thompson, JJ., concur.